IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| v. | : | CRIMINAL CASE NO.: |
| MIMS MORRIS and | : | 1:15-CR-00351-WSD-JSA |
| JOHNATHAN SILVERS, | : | |
| Defendants. | : | |

**ORDER AND REPORT AND RECOMMENDATION**

Defendants Mims Morris and Johnathan Silvers are state prisoners and alleged members of the so-called Ghostface Gang.  They are accused of conspiring with each other and various Co-Defendants, to smuggle drugs and other contraband into the prison and commit other crimes.  Currently before the Court are the motions by both Defendants to suppress the fruits of a wiretap authorized by United States District Judge Amy Totenberg. Defendants argue that the wiretap application was insufficient on its face to justify the interception order for various reasons, principally that the application failed to  demonstrate the required approval of appropriate U.S. Department of Justice officials, and that the supporting affidavit failed to establish the necessity of a wiretap.  For the reasons explained below, the Court **RECOMMENDS** that these Motions to Suppress

[121] [142] [150] [154] [157] be **DENIED.**[1]

## I.    THE WIRETAP APPLICATION

On August 5, 2014, Assistant United States Attorney Brent Alan Gray submitted an application for, and U.S. District Judge Amy Totenberg authorized, interception of wire and electronic communications on a particular cellular phone associated with Defendant Morris for a period of thirty days.  *See* Application ("App.") [142-1]; Order [142-3].  The Application was supported by an Affidavit executed by Special Agent James Hosty of the Federal Bureau of Investigation ("FBI").  *See* Affidavit ("Aff.") [142-2].

The application states:

Pursuant to 18 U.S.C. § 2516, the Attorney General of the United States has specially designed the Assistant Attorney General in charge of the Criminal Division and any Deputy Assistant Attorney General of the Criminal Division to exercise the power conferred on the Attorney General by 18 U.S.C. § 2516, to authorize this Application. Under the power designated to him or her by special designation fo the Attorney General pursuant to Order Number 3055-2009 (executed on February 26, 2009), Acting Deputy Assistant Attorney General David A. O'Neil, an appropriate official of the Criminal Division, has authorized this Application. See Attachment A. Attached to this Application are copies of the Attorney General's Order of Special Designation and the Memorandum of Authorization approving this Application authorizing the interception of wire and electronic communications. See id.

---

[1] As a ministerial matter, the Court nevertheless **GRANTS** Defendant Morris's Motion to Adopt [167] Defendant Silvers's reply brief.  At the pretrial conference [149], the Court previously **DEFERRED** Defendant Morris's Motion to Suppress Statements [141] to the District Judge.

App. ¶ 6.  The application also included a memorandum approving the wiretap application in this case signed by David A. O'Neil, Acting Deputy General, Criminal Division.  *See* [142-1] at 22.  This memorandum included an additional signature line for Leslie R. Caldwell, Assistant Attorney General, Criminal Division, although that signature line was left blank.  *Id.*  It is also undisputed that although the application stated that the Attorney's General's Special Designation Order was attached, the document was not in fact, attached.  *See* Gov't Br. [160] at 17 n. 7.

According to the Affidavit, Defendant Morris and other state prisoners (including Defendant Adam Smith) are members of the Ghostface Gang, who arrange for cellular telephones to be illegally smuggled into state prisons and then use those phones to engage in drug trafficking and fraud schemes.  *See* Aff. ¶¶ 10, 22-28.  The FBI's information in part came from two Confidential Human Sources–CHS 1 (an individual located outside of the prison who was in contact with Defendants Morris and Smith) and CHS 2 (a fellow prisoner at Phillips State Prison).   Smith generally bragged to CHS1 that gang members obtain phones and other contraband via corrupt prison employees, and then use those cellular phones to commit other crimes both inside and outside the prison.  *Id.*  ¶¶ 29-30.  Such crimes include drug trafficking and wire fraud against victims outside of the prisons.  *Id.*

In May 2014, Smith asked CHS1 to participate in a wire fraud scam, which required "people on the street" to "wash the money." *Id.* ¶ 31.  Specifically, Smith asked CHS 1 to purchase pre-paid debit cards, which would then be loaded with money obtained from "scamming" people. *Id.* CHS 1 would then be asked to withdraw the money from the card, purchase a new card, to send back to the inmates. *Id.* ¶¶ 25, 31.

 At one point, CHS 1 was approached by Defendants Morris and Smith to purchase methamphetamine, which would be smuggled in by a prison employee. *Id.* ¶ 39.  The affidavit details certain other conversations among Morris, Smith and CHS 1 about CHS 1's assistance in arranging for drug transactions and bribery transactions with specific corrections department employees. *Id. See, e.g., id.* ¶¶ 41-54.

The affidavit also included information from CHS 2, who as a fellow inmate with Morris and Smith was able to supply or corroborate important information, including as to Morris's new telephone numbers. *See, e.g., id.* ¶ 64.  CHS 2 also provided information, among other things, as to Morris's efforts to purchase and import drugs, which included asking for CHS 2's assistance in locating sources of supply. *See, e.g.,* ¶ 68.

In explaining the necessity of a wiretap, the Affidavit outlined the reasons why other investigative steps including ongoing use of CHS 1 and CHS 2 would

not be sufficient.  *See* Aff.  ¶¶ 81-129.  The Defendants in their motions only challenge the assertions in the affidavit regarding the limitations of using CHS 1 and CHS 2.

According to the affidavit, "[a]lthough the information and evidence CHS 1 and CHS 2 have provided has been helpful to date, they are constrained by certain significant limitations, and those limitations will hinder the accomplishment of the INVESTIGATORY GOALS."  *Id.* ¶ 89.  Specifically, CHS 1 does not have "regular in-person contact" with Morris, only communicates with him by phone, and "does not communicate with anyone else [other than Morris or Smith] in the organization on a personal basis."  *Id.*  ¶ 90. Morris is particular guarded and shares "minimal" information with CHS 1; while Smith provides more information, that information is also "limited."  *Id.*  Both Morris and Smith owed CHS 1 money at the time of the application, and they were "reluctant to use him/her in new operations because of the debt."  *Id.*

On July 24, 2014, Smith also told CHS 1 that he (Smith) was no longer dealing with Morris because of a dispute over money.  *Id.* ¶ 91.  Thus, Smith instructed CHS 1 not to speak with Morris any more.  *Id.*  According to the affidavit, "CHS1 is not currently in position to call TARGET TELEPHONE 1 and/or MORRIS because the only way for CHS1 to get MORRIS' telephone number is through SMITH."  *Id.*

As for CHS2, he/she is not a Ghostface Gang member and is not directly involved with Morris's and Smith's illegal dealings with corrupt prison employees and most other illegal activities. *Id.* ¶¶ 92, 93. The agent concluded that it would be highly unlikely that CHS2 would ever become a trusted member of the organization such that he/she would learn more than a "narrow insight of the inner-workings of [the gang]." *Id.* ¶ 95. The agent also concluded that neither source would be in a position to get into direct contact with all of Morris's or the other gang members' suppliers, distributors or couriers or the corrupt prison employees who facilitate the crimes. *Id.* ¶¶ 95-96.

## II.   DISCUSSION

Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III"), 18 U.S.C. §§ 2510-2522, regulates both the interception and disclosure of intercepted communications. The statute, among other things, establishes a rigorous regime that the Government must follow to intercept the contents of any wire or oral communications. As with a search warrant, the issuance of a wiretap order requires that a judge find sufficient facts to support a finding of probable cause to believe that an offense is being committed, has been committed or is about to be committed. 18 U.S.C. § 2518(1)(b). To obtain an order authorizing a wiretap, a federal agent must set forth not only information about the suspected offense and the evidence sought, but also a detailed statement as to whether

alternative investigative techniques have been tried or, if not, why those alternatives would be futile or unreasonably dangerous.  18 U.S.C. § 2518(1)(c).  Further, an application for a Title III wiretap order must be approved at the highest levels of the Justice Department under 18 U.S.C. § 2516, which ensures an additional layer of scrutiny and accountability.  If wiretap information is gathered in violation of the safeguards of Title III, any "aggrieved person" may move to suppress the contents of any intercepted communication, or evidence derived therefrom, sought to be used against him or her in any state or federal proceeding.  18 U.S.C. § 2518(10)(a).

## A.   *Standing*

A defendant seeking to suppress evidence is not entitled to relief or even an evidentiary hearing unless he or she alleges facts that if proved would establish the threshold question of standing.  *See United States v. Sneed*, 732 F.2d 886, 888 (11th Cir. 1984).  To establish standing, a defendant cannot rely simply on the Government's theory or allegations.  *See United States v. Thompson*, 171 F. App'x 823, 828 (11th Cir. 2006) (concluding that motion to suppress relying on government contention that room was rented by defendant was insufficient to demonstrate standing to warrant an evidentiary hearing).

"In order to contest an order permitting the interception of communications, a defendant must establish that he was an 'aggrieved person.'" *United States v.*

*Ortega-Estrada*, Criminal File No. 1:07-CR-356-TWT, 2008 WL 4716949, at *2 (N.D. Ga. Oct. 22, 2008) (quoting 18 U.S.C. § 2518(10)(a)), adopted at *1. "Such a person is defined in the relevant statute as a 'person who was a party to an intercepted . . . communication or a person against whom the interception was directed.'" *Id.* (quoting 18 U.S.C. § 2510(11)).

The Government here concedes that Morris meets the statutory definition of "aggrieved person," as Morris was specifically named as a target in the wiretap order.  As for Silvers, the Government further acknowledges that he at least arguably qualifies under the statutory definition of "aggrieved person," because he admits in his brief that "he was a party to communications intercepted pursuant to Judge Totenberg's August 5, 2014 order . . . ." Gov't Br. [160] at 9.[2]

Nevertheless, the Government argues that Defendants' motions should be denied on the grounds that–despite meeting the literal statutory definition of "aggrieved person"–Defendants lacked any Fourth Amendment privacy interest in

_____

[2] The Government asserts that it is "unclear" whether Silvers actually meets the statutory definition, because he did not include a sworn affidavit admitting to participating in specific intercepted calls.  *Id.*  The Government, however, does not actually take a position on this question and therefore the Court does not reach it either.  Moreover, even if the Court were to agree that Defendant must supply sworn testimony to establish his standing, the Court would not recommend dismissal on that ground at this juncture but rather would schedule an evidentiary hearing or otherwise permit Defendant the opportunity to supply an affidavit.  Such a step is unnecessary here because, even if Silvers has standing, the motion otherwise fails on the merits as discussed below.

their communications over illegal contraband cellular phones while in prison.

Some courts have concluded that the standing provision of § 2518(10)(a) "is to be

construed in accordance with standing requirements usually applied to suppression

claims under the fourth amendment." *United States v. Ruggiero*, 928 F.2d 1289,

1303 (2d Cir. 1991) (quotations and citations omitted); *see also Alderman v.

United States*, 394 U.S. 165, 174-175, n. 9 (1969) (stating, although in apparent

*dicta*, that "[Title III's] legislative history indicates that 'aggrieved person,' the

limiting phrase currently found in Fed.Rule Crim.Proc. 41(e), should be construed

in accordance with existent standing rules.").[3]

    The Government's argument as to Defendants' lack of any reasonable

expectation of privacy is compelling.  After all, the Supreme Court long ago held

that:

> society is not prepared to recognize as legitimate any subjective
> expectation of privacy that a prisoner might have in his prison cell and
> that, accordingly, the Fourth Amendment proscription against
> unreasonable searches does not apply within the confines of the prison
> cell. The recognition of privacy rights for prisoners in their individual

---

[3] *Alderman*'s comment on the meaning of "aggrieved person" in Title III appears to be *dicta*, because the surveillance at issue in *Alderman* was undertaken prior to the enactment of Title III.  The Supreme Court generally analyzed the propriety of the telephonic surveillance in that case under pre-Title III authority, including the Fourth Amendment itself and the then-current version of Fed.R.Crim.P. 41(e). The Court simply offered as *dicta* a comment that Congress did not intend to expand the standing rules "[i]n its recent wiretapping and eavesdropping legislation," i.e., Title III, which had been enacted during the pendency of the *Alderman* case.  *Alderman*, 394 U.S. 174-175, n. 9.

> cells simply cannot be reconciled with the concept of incarceration and
> the needs and objectives of penal institutions.

*Hudson v. Palmer,* 468 U.S. 517, 525-26 (1984).  It is difficult to see how a

prisoner who generally lacks any reasonable expectation of privacy in his own

prison cell somehow can reasonably expect privacy for furtive conversations over a

contraband cellular phone that he or she is illegally possessing in that cell.  Indeed,

some courts have specifically held that the procedures and protections of Title III

do not apply to illegal prison cellular phone calls.  *See United States v. Garibay*,

2015 WL 468404, *4 (February 3, 2015) ("It would be an ironic interpretation of

the law to find that a prison inmate, who by virtue of his initial crime and

conviction, when he is placed in a cellblock where he has no Fourth Amendment

rights, and when he commits a further crime by obtaining and using a contraband

cellular telephone, acquires a statutory right under Title III to be free from law

enforcement eavesdropping, unless a Title III wiretap order is first obtained.")


Nevertheless, the Government does not supply any direct authority from

within this Circuit on this question, or on the broader question of whether an

individual who qualifies for standing under the plain words of Title III can be

denied standing because he does not also possess a constitutionally-recognizable

expectation of privacy.  The Court finds it unnecessary to reach these questions of

first impression because, as explained below, Defendants do not even arguably

demonstrate violations of Title III's procedural requirements.

### B.    *Department Of Justice Approval*

The statute provides that

> The Attorney General, Deputy Attorney General, Associate Attorney
> General, or any Assistant Attorney General, any acting Assistant
> Attorney General, or any Deputy Assistant Attorney General or acting
> Deputy Assistant Attorney General in the Criminal Division or National
> Security Division specially designated by the Attorney General, may
> authorize an application to a Federal judge of competent jurisdiction for,
> and such judge may grant in conformity with section 2518 of this
> chapter an order authorizing or approving the interception of wire or oral
> communications by the Federal Bureau of Investigation . . . .

18 U.S.C. § 2516(1).

The statute further requires that the application shall state, among other

things, "the identity of the investigative or law enforcement officer making the

application, and the officer authorizing the application," and that the order shall

specify, among other things, "the identity of the agency authorized to intercept the

communications, and of the person authorizing the application . . . ."  18 U.S.C. §§

2518(1)(a)&(4)(d).

Thus, courts have found violations and suppressed communications obtained

by wiretap where an application simply states that "'an appropriate official of the

Criminal Division' had given authorization"–without identifying the specific

authorizing officer, as the statute clearly requires.  *See United States v. Lomeli*, 676

F.3d 734, 739 (8th Cir. 2012).

Here, by contrast, both the application and the order clearly identify the authorizing officer and his title, that is, Acting Deputy Assistant Attorney General David A. O'Neil.  *See* App. ¶ 6; Order ¶ 6A.  Defendants argue that "the Government provides no foundation to support its assertion that Mr. O'Neil was ***specially*** designated."  *See* Morris Reply Br. [166] at 5 (emphasis in original).  But Defendants cite no legal support to suggest that the Government was required to attach documentary proof of the identified official's authority.  In fact, the Eleventh Circuit has expressly rejected this argument, albeit in a non-published decision.  *See United States v. Holden*, 603 Fed.App. 744 (11th Cir. 2015) (per curiam).  Although non-precedential, this opinion is highly persuasive, and is a correct application of the statutory language itself, which includes no requirement that the Government *prove* the authority of the authorizing official.

Defendants cite only *Lomeli* to the contrary.  *See* Morris Reply Br. [166] at 5; *see also* Morris Opening Br. [142] at 5-6.  But, as noted above, the problem in *Lomeli* was that the application failed to name any specific authorizing officer at all, which was in clear violation of the statute.  *Lomeli* does not suggest that an application that actually identifies the authorizing officer must also supply documentary proof of that person's authority.

To be sure, it is confusing that the application referred to the Attorney

General's special designation order as being attached, when it was apparently not attached. But suppression is not warranted simply because the application contained an inaccurate statement as to whether a document was attached. The standards for considering inaccuracies in an affidavit filed in support of a search warrant or wiretap application were set by the Supreme Court's decision in *Franks v. Delaware*, 438 U.S. 154 (1978). *See United States v. Novaton*, 271 F.3d 968, 986 (11th Cir. 2001) (applying the *Franks* standard to alleged false statements in a wiretap application). First, *Franks* requires allegations of "deliberate falsehood or of reckless disregard for the truth," not just "negligence or innocent mistake . . . ." *Franks*, 438 U.S. at 171-72. Defendants do not allege any deliberate scienter here. Nor could they credibly do so in these circumstances. It is nonsense to suggest that the applicant deliberately lied about a document being attached, when it would have been obvious to any reviewing judge that the attachment was not attached.

Second, even in cases of deliberate falsehoods, suppression is not warranted unless "the remaining content is insufficient" to support the issuance of the warrant. *Id.* Here, even if the Court were to set aside the inaccurate reference to the existence of an attachment, the remaining content of the application is more than sufficient to justify issuance of the interception order. As noted above, the statute requires only that the authorizing official be identified, which the application did. Thus, excising the application's reference to extraneous,

unnecessary supporting attachments would not have undermined the sufficiency of the application.  Indeed, Judge Totenberg found the application sufficient and issued the interception order despite the obvious failure to attach the Attorney General's special designation order.[4]

Relatedly, Defendant argues that the documentation that was actually attached as Attachment A to the application–an authorizing memorandum to the Director of the Office of Enforcement Operations ("OEO"), and an authorizing memorandum to the prosecuting Assistant United States Attorney, *see* [142-1] at 19-22–failed to establish Mr. O'Neil's authority.  The first memorandum, according to the header, is "from" Leslie R. Caldwell, Assistant Attorney General for the Criminal Division, "to" the Director of OEO, and it refers to the "undersigned" as having authority to approve wiretap applications.  *See id.* at 19-20.  Yet, as Defendant points out, Ms. Caldwell's signature line is blank, and the memorandum is signed instead by Mr. O'Neil as Acting Deputy Assistant Attorney General.  *Id.*  The second memorandum, to the Assistant U.S. Attorney, also contains a blank signature line for Ms. Caldwell and is signed instead solely by Mr.

---

[4] Moreover, although the special designation order may not have been specifically attached to the application, Defendant Morris has obtained and filed that document, *see* [142-4].  The document makes clear that "any Acting Deputy Assistant Attorney General of the Criminal Division" is specially designated to approve interception orders.  *See id.*  Thus, there is no suggestion that Mr. O'Neil actually lacked authority to sign the approval.

O'Neil.  *Id.* at 21-22.

Again, however, these documents were not required to be attached.  It is difficult to see how alleged irregularities in extraneous, unnecessary attachments would give rise to suppression.  But, in any event, the documents do not impugn Mr. O'Neil's authority.  That these form documents include additional signature blocks unused in this case does not in itself show that Mr. O'Neil lacked authority to approve this application.  While it is somewhat confusing that the OEO stated in the header that it was "from" Ms. Caldwell, but then ultimately was signed by Mr. O'Neil, also does not in itself support Defendant's theory.  The memorandum made clear that the "undersigned" was acting under authority to approve the application, and the "undersigned" in this case (Mr. O'Neil) was identified as a specially designated official.  Thus, Defendants fail to show any violation of Title III's authorization requirement.

### C. *Necessity*

Congress requires an application for interception to contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. § 2518(1)(c).  "The necessity requirement is designed to ensure that electronic surveillance is neither routinely employed nor used when less intrusive techniques will succeed." *United States v. Van Horn*, 789

F.2d 1492, 1496 (11th Cir. 1986). "The affidavit in support of a search warrant must simply explain the retroactive or prospective failure of several investigative techniques that reasonably suggest themselves. However, a comprehensive exhausting of all possible investigative techniques is not necessary before applying for a wiretap." *United States v. De La Cruz Suarez*, 601 F.3d 1202, 1214 (11th Cir. 2010) (quotation marks and citations omitted).

Wiretap affidavits are evaluated in a "common sense fashion," and "the determination of when the Government has satisfied [the statutory] requirement must be made against flexible standards, and . . . each case must be examined on its own facts." *United States v. Hyde*, 574 F.2d 856, 867 (5th Cir. 1978).  Most importantly, Defendant must overcome the presumption of validity that attaches to the District Judge's issuance of the interception orders, which necessarily included a finding that the necessity requirement has been met.  *United States v. Mitchell*, 274 F.3d 1307, 1310 (10th Cir. 2001).  In other words, the issuing judge enjoys "broad discretion" in considering the application, *United States v. Alonso*, 740 F.2d 862, 868 (11th Cir. 1984), which cannot be overturned unless "clearly erroneous." *United States v. Weber*, 808 F.2d 1422, 1424 (11th Cir. 1987).

Defendants' argument is that the investigation could have continued to rely on CHS 1 and CHS 2 instead of using the more intrusive technique of an interception order.  This argument is meritless.

The application made clear that the investigation went beyond Defendants Morris and Smith–the individuals that CHS 1 communicated with. Nothing about CHS 1 or CHS 2's information suggested that they were or could get in a position to directly communicate with all of Morris and Silvers' co-conspirators, including their sources of supply for drugs and contraband, the outside Green Dot card launderers, and the corrupt prison guards being bribed. And these sources were not necessarily able to insert themselves in communications with every other prisoner engaging in similar crimes.

The evidence supplied by CHS 1, for example, shows that he or she was used by Smith and Morris as someone on the street to assist outside the prison in particular acts of money laundering and smuggling. While CHS 1's information was undoubtedly helpful as to building a case against Smith and Morris, this did not shed light on everything Morris and Smith were doing, much less who else was involved and to what extent. As a concrete example of how the wiretap expanded the scope of the investigation, Defendant Silvers was not even identified by the two CHS sources.

Defendant Silvers questions whether the Government really believed the claim that Defendants Smith and Morris had a falling out over money, which allegedly threatened CHS 1's access to Defendant Morris. According to Silvers, "[t]he government didn't believe that the falling out over money was real; it

believed the story was orchestrated by Messrs. Smith and Morris as an excuse not to repay monies owned to CHS 1." Silvers Br. [150] at 7. Silvers cites no support for this assertion as to what the Government "believe[d]." More importantly, it does not matter. If the Defendants were lying to CHS 1–distancing themselves to avoid having to repay debts–that only further emphasizes how CHS 1 could not be counted upon to gain full access to the conspiracy.

As to CHS 2, Defendants point out that he/she knew phone numbers of coconspirators and had other information about sources of drug supply. But there is no suggestion that CHS 2 was included in Morris's and Smith's communications with coconspirators or were being brought into their operations in any sort of comprehensive way. Indeed, Agent Hosty specifically testified that neither source were considered trusted, inner-circle conspirators who were provided extensive information about the operations.

Thus, the information supplied in the affidavit provided quintessential grounds for the necessity of a wiretap order. The technique was reasonably necessary to expand the investigation beyond the specific but limited evidence of criminal activity by a limited number conspirators, to a broader picture of everything this criminal organization was doing and through whom. The affidavit thus adequately shows necessity. Or, at a minimum, there is no basis to second-guess Judge Totenberg's decision that the facts stated in the affidavit adequately

established necessity.[5]

### D.   *Other Arguments*

In his opening brief, Defendant Morris states that the discs he received in discovery include recorded calls as early as June and July 2014, which preceded the time period authorized by Judge Totenberg's August 5, 2014 interception order.  Thus, Defendant suggests that the Government illegally intercepted calls prior to the authorization granted by Judge Totenberg, and those calls must be

---

[5] Defendant Morris's reply brief asserts a variety of facts outside the four corners of the affidavit as to the identities of the confidential sources, their potential "credibility issues," and the contents of various communications apparently produced in discovery between the sources and Agent Hosty and others. *See* Def. Morris Reply Br. [166] at 2-3.  Generally, a review of the issuance of a wiretap order is limited to the information presented to the issuing Judge, except in cases of alleged *Franks* violations.  Defendants here do not allege *Franks* violations or otherwise supply any authority to suggest that the Court can consider proffers of facts outside the affidavit.  Nevertheless, the Court has considered the new facts alleged by Defendants and finds them immaterial to the necessity finding.  Defendant Morris points out that CHS 2 told Hosty that he was asked to participate in an illegal "print shop operation" and also that he would have increased access to officers and staff because he was serving as the warden's orderly.  But this does not mean that CHS 2 was in a position to uncover the full breadth of Ghostface Gang activity at the prison, and record incriminating conversations with the wide range of inmates and employees that the FBI believed were involved.  Defendant also alleges that, contrary to Agent Hosty's suggestion in the Affidavit, CHS 1 had the means to contact Morris directly and not just through Smith.  But that CHS 1 could have contacted Morris, even after he/she was instructed not to by Smith, does not itself establish that such contacts would have revealed the full extent of the gang's criminal activity in Phillips state prison.  After all, Morris was particularly guarded with CHS 1, *see id.*  ¶ 90, and it would be reasonable to assume his guardedness would only increase in light of Morris's dispute with Smith about money.

suppressed.

The Government, however, represents that the discovery in the case shows that any recorded calls involving Defendant Morris preceding August 6, 2014 were consensually-recorded calls, not intercepted calls.  *See* Gov't Br. [160] at 19 n. 9. This is hardly surprising, since Agent Hosty's Affidavit refers to recorded telephone calls between Defendant Morris and CHS 1 in June and July 2014.  *See, e.g.,* Aff. ¶ 52.  Defendants do not respond to the Government's representation of the consensual nature of the pre-August calls, or indicate any factual dispute on this question.  Thus, because these calls were not intercepted pursuant to Title III, the Court finds Defendant's timing argument to be moot.

Defendant Morris's reply brief makes a few other assertions that appear to constitute new arguments.  Specifically, Morris states that "[t]he Government alleges that Morris is a leader of the Ghostface Gang at Phillips State Prison (Aff. ¶ 35). No source is listed for this conclusory statement and counsel insists on proof of said allegation."  Morris Reply Br. [166] at 2.  Morris also proffers the identity of CHS 1, as allegedly Defendant Smith's wife, and then argues that "[t]he derogatory statements made by co-defendant Adam Smith against Morris, raises credibility issues about CHS 1's statements about Morris."  *Id.*

Morris, however, does not explain how he expects the Court to act on these assertions and what suppression argument they relate to.  These assertions do not

appear to relate to the necessity, authorization, or timing issues raised in Morris's motion.  If anything, any bias that CHS 1 might have towards Morris would undermine Morris's necessity argument, to the extent Morris continues to argue that the Government could have continued the investigation through additional undercover activity by the allegedly-biased CHS 1.  These allegations appear, rather, to suggest an attack on the existence of probable cause.  Or perhaps Defendant suggests a *Franks* violation to the extent he believes that the affidavit omitted a critical fact about CHS 1's reliability.  In any event, the Court rejects any such new arguments, as Defendant is not permitted to raise them for the first time in his reply brief.

Even if the Court were to entertain these new arguments, they would fail. The existence of probable cause does not turn on the single allegation that Morris is a leader of the Ghostface Gang.  And Morris's claim as to CHS 1's bias does not render the affidavit insufficient either.  CHS 1 is not the only source of information against Defendant Morris.  Moreover, according to the affidavit, much of the information related to CHS 1 is in the form of consensually-recorded phone calls or text messages, which are largely not subject to impeachment.  In other words, even if the affidavit disclosed the alleged relationship between CHS 1 and Defendant Smith, that would not materially detract from the reliability of the recorded calls and texts that CHS 1 produced with regard to his/her conversations

with Defendant Morris.[6]

### E.   *Interception of Electronic Communications*

For the reasons stated above, the undersigned finds no suppression to be warranted.  In case any reviewing court were to disagree, it bears further noting that any suppression would be limited to the oral (i.e., not electronic/text) communications intercepted in this case.  The Eleventh Circuit has stated that no suppression remedy exists under Title III for unlawfully intercepted *electronic* communications, because "electronic communications" do not appear in 18 U.S.C. § 2515.  *See United States v. Steiger*, 318 F.3d 1039, 1050-52 (11th Cir. 2003).  Defendants offer no response and do not appear to contest this legal proposition.  Thus, any suppression in this case–should there be any–should be limited to Defendants' oral and not electronic (i.e., text) communications.

### III.   CONCLUSION

Thus, the Court **GRANTS** Defendant Morris's Motion to Adopt [167] but otherwise **RECOMMENDS** that the Motions to Suppress Intercepted Communications  [121] [142] [150] [154] [157] be **DENIED**.

---

[6] Also, Defendant does not allege scienter on Agent Hosty's part with regard to the omission of these supposed facts.

This matter is now **READY FOR TRIAL**.

**IT IS SO ORDERED** this 15th day of July, 2016

_____
JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE